# STATE OF MICHIGAN

# COURT OF APPEALS

JEVON MAURICE WILLIAMS,

        Plaintiff/Counter-Defendant-
        Appellee,

v

KAY MARIE CANNON,

        Defendant/Counter-Plaintiff-
        Appellant.

UNPUBLISHED
October 24, 2017

No. 335922
Ingham Circuit Court
Family Division
LC No. 16-000380-DM

Before: MARKEY, P.J., and RONAYNE KRAUSE and BOONSTRA, JJ.

PER CURIAM.

Defendant appeals by right the judgment of divorce entered following a bench trial. After the trial concluded, the trial court entered an order adopting the Friend of the Court's recommendation that plaintiff be granted sole legal and physical custody of the parties' two minor children, with defendant to receive supervised parenting time. The judgment of divorce incorporated those terms and also awarded the parties their respective pensions as part of the property division. We affirm with regard to child custody, but remand for further proceedings regarding the property division.

## I. PERTINENT FACTS AND PROCEDURAL HISTORY

The parties were married for 13 years and have four children, two of whom are minors. Plaintiff filed a complaint for divorce on February 7, 2016. The parties initially had joint legal and physical custody of the minor children with alternating weeks of parenting time. On June 20, 2016, plaintiff filed for a personal protection order (PPO) against defendant, alleging that she was stalking him, swearing at him, and threatening him. The trial court granted the PPO.

On June 26, 2016, plaintiff and defendant had an encounter that began in a Quality Dairy store parking lot. Plaintiff testified at the bench trial that he stopped at the store with the two minor children to get some juice. The two children stayed in the car while he went into the store. Defendant testified at trial that, while on her way to work, she saw plaintiff's car parked at the store and stopped to see and hug the children. She stated that she then went back to her car to continue on her way to work. Plaintiff testified that he saw defendant running away from his car,

-1-

and that the parties' 14-year-old daughter told him that defendant had taken his phone. Plaintiff then "lost control" and started banging on defendant's car window, telling her to give him his phone back. He stated that defendant drove off, and that he got into his car and followed her. Plaintiff testified that he then rammed defendant's car three or four times with his own car while the children were still in his vehicle. Plaintiff admitted that his actions were wrong, acknowledged that he was sentenced to serve probation under a plea agreement relating to charges stemming from the incident, and explained that he had enrolled in anger management classes.

Subsequently, the trial court issued an ex parte order granting defendant sole custody of the two minor children and referred the matter to the Friend of the Court for conciliation. After hearing from both parties in separate conciliation sessions, the conciliator issued a recommendation to award sole custody of the two minor children to plaintiff, with defendant to receive supervised parenting time. The trial court adopted the conciliator's recommendations as the temporary order of the court.

The trial court held a one-day bench trial in October 2016, hearing testimony from plaintiff, defendant, and plaintiff's 18 year-old daughter. Plaintiff testified to the Quality Dairy incident as described. Plaintiff also testified that both parents love the children and that the children love both parents. He stated that he coaches football and wrestling for their son and takes him to all of his wrestling meets. Plaintiff also stated that defendant has been to some of their son's activities. Plaintiff further testified that he is confident in his ability to continue the children's education, that he can financially provide for the children, and that he has no mental or psychological illnesses. He described defendant as a "really, really good mom" for their first two children, but opined that she became emotionally detached sometime between the first two children growing up and the birth of the two minor children.

According to plaintiff, defendant was now always "sleepy" and "dazed," and she had a "flighty" temperament. Plaintiff testified that he believed that defendant abused prescription narcotics, which were prescribed for her lower back problems. He stated that defendant had more painkiller medication than she was prescribed to have and took more than she was prescribed to take. Defendant denied taking more medication than she was prescribed. Plaintiff testified that he had been prescribed narcotic medication for his own back problems, and that his painkillers would "come up missing." Plaintiff also testified that he has a medical marijuana card for his lower back pain, but that he does not use marijuana around the children.

The parties' 18-year-old daughter testified that she and her older sister had also been prescribed painkillers for the treatment of injuries, and that defendant had asked them to keep telling the doctor that they were still in pain so that they would continue to be prescribed narcotics. The daughter testified that she rarely took her prescribed medication, but that she occasionally asked defendant for some because defendant was the one who would pick up the medication. The daughter stated that when she would ask defendant for medication, defendant would sometimes tell her that there was none left. Defendant denied that she instructed her daughters to obtain medication from their doctor for defendant's use.

The trial court also questioned defendant concerning a notation in the conciliator's report indicating that defendant had reported to police on one occasion that 100 Vicodin pills had been

-2-

stolen. The trial court asked defendant to explain why she had so many Vicodin pills in her possession. Defendant explained that she was prescribed 224 Vicodin pills per month, and showed the trial court prescription records to confirm this. The trial court, after reviewing the prescriptions, stated: "So the conciliator, in my estimation, might have overreacted, to a certain extent, because . . . the conciliator thought that was abnormal for someone to have [100 Vicodin pills], but that doesn't mean that it's untoward."

Plaintiff also testified to witnessing defendant vandalize his car, and to other incidents of vandalism for which he believed defendant was responsible. Defendant denied vandalizing either of plaintiff's vehicles but admitted spray-painting plaintiff's "man cave" in the garage, as well as stealing his belongings and, on one occasion, having their minor son give plaintiff, "for Father's Day," a patch that she had cut from one of plaintiff's stolen shirts. Plaintiff also testified that defendant had phoned his employer, Michigan State University (MSU), telling his supervisor that plaintiff had stolen MSU property. Defendant admitted calling plaintiff's supervisor but stated that she was trying to have the supervisor talk to plaintiff because she feared that plaintiff would become physically violent.

Plaintiff also testified that defendant once threw a phone at their 18-year-old daughter, and that the daughter had called the police, who then referred the case to Child Protective Services. Plaintiff also testified that while he was away on a trip to New Jersey, defendant let her brother spank their 18-year-old and 14-year-old daughters with a belt. Defendant denied that her brother had done so.

Plaintiff testified that no one had paid the marital home rent since he moved out on February 7, 2016, that defendant and the minor children were consequently evicted from the marital home, and that the minor children subsequently moved in with plaintiff at his mother's house. Defendant testified that the minor children had been living with plaintiff for 31 days before the bench trial, and that she began living in transitional housing for domestic violence victims after the eviction. Defendant testified that she wants custody of the two minor children during the school year because plaintiff was "not the one that does the schooling," and that plaintiff took the children out of school for "no reason."

After the close of proofs, the trial court interviewed the minor children in chambers about their preferences regarding custody. The trial court then determined that there was no established custodial environment with either parent, and discussed and weighed the relevant statutory best-interest factors set forth in MCL 722.23. The trial court found that factors (a), (c) and (e) did not favor either party. The court found that factor (b) favored plaintiff, noting that defendant was impaired by "emotional instability" and her "high level of use of prescription medication." The court also found that factor (d) favored plaintiff because the children were living with him at his mother's house, which provided some stability. The court noted that defendant was living in a domestic violence shelter that was not an "appropriate place for the children to live." The court also found that factor (i) favored plaintiff because the children believed that defendant was not "in a good place" and wanted to see her in a good place. The court also found that factor (j) heavily favored plaintiff because defendant's various actions, including spray-painting plaintiff's garage and cutting up plaintiff's shirt, undermined the children's relationship with their father. Concerning factor (k), the court found that defendant was the primary victim of domestic violence and that this factor therefore favored her, but it

-3-

stated that some of her own acts were violent and shocked the court. The court did not state which party factor (f) favored, although it noted that the Quality Dairy incident weighed against plaintiff "as it relates to criminality," and that defendant's use of her daughter's medication weighed against her. The court also did not reach a conclusion on factor (h), although it described plaintiff's action in keeping the children out of school for a week as an "overreaction." The court did not address factors (g) or (*l*).

In summing up its findings, the trial court stated to defendant, "So I find, ma'am, where you're at right now is where the conciliator thinks you're at. And I've signed an order today that adopts the Friend of the Court's recommendation, pending the entry of judgment. The judgment will include what the Friend of the Court's order provides . . . ." The trial court also stated that it wanted defendant to undergo a medical assessment and a psychological evaluation, and that it would be willing to reevaluate the custody arrangement after defendant received feedback from counseling and stabilized her housing situation, with the goal of eventually having the parties alternate weeks of parenting time.

The trial court awarded plaintiff and defendant their respective pensions as part of the property distribution. Specifically, the trial court stated:

> In terms of property, I really didn't hear a lot of testimony regarding the issues relating to property. I'm going to order the parties retain the assets that they have in their possession and that they retain their own retirement benefits, if any. So standard judgment provisions as it relates to property will enter.

The trial court issued the order, and later the judgment of divorce, as described. This appeal followed.

## II. RELIANCE ON CONCILIATOR'S REPORT

Defendant argues that she was denied due process of law when the trial court used, relied on, or adopted the conciliator's recommendation in determining custody of the parties' minor children. We conclude, however, that defendant does not accurately characterize the trial court's actions, and we hold that defendant was not denied due process of law.

All custody orders must be affirmed on appeal unless the trial court's findings were against the great weight of the evidence, the court committed a palpable abuse of discretion, or the court made a clear legal error on a major issue. MCL 722.28; *Pierron v Pierron*, 486 Mich 81, 85; 782 NW2d 480 (2010). "Under this standard, a reviewing court should not substitute its judgment on questions of fact unless the factual determination clearly preponderates in the opposite direction." *Pierron*, 486 Mich at 85 (quotation marks and citation omitted). In reviewing the findings, we defer to the trial court's credibility determinations. *Shann v Shann*, 293 Mich App 302, 305; 809 NW2d 435 (2011). We review for an abuse of discretion the trial court's discretionary rulings, such as custody determinations. *Id*. In a custody matter, "[a]n abuse of discretion exists when the trial court's decision is so palpably and grossly violative of fact and logic that it evidences a perversity of will, a defiance of judgment, or the exercise of passion and bias." *Sturgis v Sturgis*, 302 Mich App 706, 710; 840 NW2d 408 (2013).

As we have noted,

. . . Ingham County requires all domestic cases involving issues of custody, parenting time, domicile, residence, and support be referred to a conciliation conference and that, at this conference, the parties meet with a Friend of the Court employee, who employs mediation techniques in an attempt to help the parties resolve the dispute. Both Local Administrative Order 2006-2 and the Ingham County Friend of Court Handbook state that if the parties are unable to reach agreement at the conciliation conference, the conciliator will prepare a recommendation to the circuit court that will become the court's order unless either party files an objection, in which case a hearing will be held. [*Bowling v McCarrick*, ___ Mich App ___; ___ NW2d ___ (2017) (Docket No. 331583), slip op at 1.]

In this case, defendant objected to the conciliator's recommendation. A hearing on defendant's objections was scheduled for the same day as trial. The trial court made it clear that it was conducting the trial, rather than merely a hearing on defendant's objections:

Well, I'm not going to decide a temporary order based on a conciliation objection on the day of trial. I mean, I know it's [the hearing on defendant's objections] set for today, in case the trial didn't go. But we're here; therefore, the case is about, in terms of trial, about who has custody, parenting time, and support.

Contrary to defendant's assertion that the trial court merely relied on the conciliator's report and did not make its own independent custody determination, the record indicates that the trial court conducted its own best-interest analysis, and made its own independent findings of fact and conclusions of law. The court made passing mention of the conciliator's report, but never stated or implied that it was relying on that report to support its ultimate custody determination. In fact, the trial court allowed defendant to explain a specific statement in the report concerning her possession of 100 Vicodin pills, and ultimately credited defendant's explanation.

Although the trial court's findings were similar to the conciliator's findings, the trial court conducted an evidentiary hearing, went through and discussed the pertinent best-interest factors, and made independent factual findings and drew independent conclusions for each factor discussed. Further, the trial court did not merely "adopt" the Friend of the Court's proposed order, but added to the order a requirement that defendant undergo a medical assessment and a psychological evaluation. Defendant has therefore failed to establish that the trial court actually "relied" on the conciliator's report as opposed to merely referring to it during the trial while making its own findings of fact and best-interest determination. We consequently conclude that the trial court's findings were not against the great weight of the evidence, and that it did not abuse its discretion or commit a clear error of law.[1] MCL 722.28; *Pierron*, 486 Mich at 85. And to the extent that defendant argues that the trial court erred by even reviewing the conciliator's report and recommendation before making its best-interest determination, we note that

---

[1] Defendant does not otherwise challenge the trial court's findings of fact or weighing of the best-interest factors.

MCL 552.505(1)(g) allows the Friend of the Court to make a written report and recommendation to the parties *and the court* regarding child custody or parenting time or both, once proper cause or change of circumstances has been established. See also *Bowling*, slip op at 2.

## III. PROPERTY DIVISION

Defendant also argues that the trial court's decision to award the parties their respective retirement benefits was inequitable. We agree that the trial court erred by failing to consider the appropriate factors in determining whether the property division was equitable. The distribution of property in a divorce is controlled by statute. MCL 552.21 *et seq*. "In dividing marital assets, the goal is to reach an equitable division in light of all the circumstances." *McNamara v Horner*, 249 Mich App 177, 188; 642 NW2d 385 (2002). "While the division need not be mathematically equal, an equitable distribution of marital assets means that they will be roughly congruent, and any significant departures from congruence must be clearly explained by the trial court." *Id*. (citations omitted).

The following factors are to be considered by the trial court in its dispositional rulings:

> (1) duration of the marriage, (2) contributions of the parties to the marital estate, (3) age of the parties, (4) health of the parties, (5) life status of the parties, (6) necessities and circumstances of the parties, (7) earning abilities of the parties, (8) past relations and conduct of the parties, and (9) general principles of equity. . . . [*Sparks v Sparks*, 440 Mich 141, 159-160; 485 NW2d 893 (1992).]

According to the *Sparks* Court:

> It is not desirable, or feasible, for us to establish a rigid framework for applying the relevant factors. The trial court is given broad discretion in fashioning its rulings and there can be no strict mathematical formulations. But, as we have recognized before, while the division need not be equal, it must be equitable. Just as the final division may not be equal, the factors to be considered will not always be equal. Indeed, there will be cases where some, or even most, of the factors will be irrelevant. But where any of the factors delineated in this opinion are relevant to the value of the property or to the needs of the parties, the trial court shall make specific findings of fact regarding those factors. . . . [*Sparks*, 440 Mich at 158-159.]

The trial court did not conduct a *Sparks* analysis with regard to the retirement benefits at issue. We recognize that the plaintiff's counsel informed the trial court that "[w]e believe the few possessions [the parties have] are divided" and that property division was a "non issue," and that neither party submitted evidence regarding the value of their respective pensions. Nonetheless, because vested retirement benefits accrued during a marriage must be considered part of the marital estate that is subject to award, MCL 552.18(1); *Vander Veen v Vander Veen*, 229 Mich App 108, 110-111; 580 NW2d 924 (1998), we conclude that the trial court should have made specific findings of fact under *Sparks* regarding the parties' retirement benefits before awarding the parties their respective benefits, particularly given that plaintiff was employed for the entire length of the marriage while defendant was only employed for the last year of the

marriage. Because when dividing property in a divorce case a trial court must make specific findings of fact regarding factors relevant "to the value of the property or to the needs of the parties," *Sparks*, at 440 Mich at 159, we remand for the trial court to conduct a *Sparks* analysis.[2]

Affirmed with regard to the custody award. Remanded for the trial court to conduct and place on the record a *Sparks* analysis regarding the division of marital property, including the parties' pensions and retirement accounts. We do not retain jurisdiction.

/s/ Jane E. Markey
/s/ Mark T. Boonstra

---

[2] We decline defendant's request to order the trial court to simply divide both retirement benefits equally between the parties, as the record before us does not allow us to make such a determination and the trial court is in a superior position to make a property division determination in the first instance with additional evidence, if necessary.

-7-